UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| YU JUNG LEE, individually, and on behalf of others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>DONG BANG CORPORATION, MI JA KIM, JOO HEE KIM and SANG KYU KIM,<br><br>*Defendants*. | 22-cv-1336 (MEF)(SDA)<br><br>**OPINION** |

**Table of Contents**


I. Background

- A. This Case
- B. The Other Case
- C. A Conflict

II. A Resolution?

- A. The Class Action Exception
- B. The Reasons for the Exception
  - 1. Practical Problems
  - 2. Confidentiality
  - 3. Conclusion
  - 4. Implications

III. Next Steps


* * *

Workers at a local restaurant believed they were being illegally underpaid --- so they filed this lawsuit, a putative class action that they have now moved to certify.

But the motion raises complex issues --- because the lawyer for the proposed class is involved in another case, in which he is suing there one of the restaurant workers he is representing here.

Is this a conflict of interest? If yes, the motion to certify the class may need to be denied.

As to the conflict question, the Court lays out its views on some key issues --- as a prelude to getting the parties' input on next steps.

## I. Background

### A. This Case

A server[1] at a New Jersey restaurant[2] concluded that she was getting too little take-home pay. Lower hourly wages than the minimum floor set by the law. And pay that was lower yet --- because a slice of her tips were being pocketed by the restaurant's managers. See Collective and Class Action Complaint ("Complaint") (ECF 1) ¶¶ 45-80.

So the server sued the restaurant ("the Restaurant") and its owner-operators. See id. ¶¶ 10-14.

From here, call the server "the Plaintiff." Those she has sued are "the Defendants."[3]

The Plaintiff did not file the lawsuit just for herself. She aims to represent a class of around 53 people who work at the Restaurant or have worked there.[4] Servers like the named

---

1 Yu Jung Lee.

2 The Dong Bang Grill.

3 "The Defendants" includes one entity and three people. The entity is the Restaurant, Dong Bang Grill. See Complaint ¶ 10. The people are Mi Ja Jim, Joo Hee Kim, and Sang Kyu Kim, the Restaurant's alleged owner-operators. See id. ¶ 11.

4 See Memorandum of Law in Support of Plaintiff's Motion for Class Certification Pursuant to Fed. R. Civ. P. 23 ("Plaintiff's Brief") (ECF 108-1) at 1.

Plaintiff.[5] Plus some "bussers"[6] --- whose main job is to run food and dishes out and back, from the kitchen to the tables and from the tables to the kitchen. See Plaintiff's Deposition at 35:1-12.

* * *

The Plaintiff now moves to certify a servers-and-bussers class. See Plaintiff's Brief at 1.

To do that, she must show, among other things, that her lawyer can "adequately" represent the proposed class. See In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 780 (3d Cir. 2009); Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

And a lawyer who has a conflict of interest, and who must be disqualified on that basis --- he cannot pass the adequacy test.[7]

For this Opinion, the Plaintiff's lawyer is a central figure. Call him "the Lawyer."[8]

### B. The Other Case

Look now to another lawsuit.

That second suit has some overlap with this one. Same restaurant, mostly the same defendants (plus some others). But a different sort of case.

The nub of the second lawsuit: a server at the Restaurant suing (i) the Defendants (including the Restaurant) for allegedly allowing sexual harassment, and (ii) a particular busser for

---

[5] See Declaration of Diane H. Lee, Esq. in Support of Defendants' Motion for Partial Summary Judgment ("Diane Lee Declaration"), Exhibit B ("Plaintiff's Deposition") (ECF 54-2) at 37:20-38:21.

[6] See Diane Lee Declaration, Exhibit C ("Ju Hi Kim Deposition") (ECF 54-3) at 46:12-15 (using this term).

[7] Because he cannot appear in the case at all. See In re Fine Paper Antitrust Litig., 617 F.2d 22, 27 (3d Cir. 1980) ("If in maintaining the class action . . . the attorneys should be disqualified because of a conflict of interest, then certainly . . . there is inadequate representation of the class's interests.").

[8] Ryan Kim.

allegedly doing the sexual harassment. See First Amended Complaint ("Discrimination Complaint"), Lee v. Dong Bang Corp. et al., No. 23-cv-21824 (D.N.J. May 10, 2024) (ECF 7) ¶¶ 16, 21, 24, 27-28, 31.[9]

The busser sued in the second lawsuit is called, from here, "the Busser."

The sexual harassment lawsuit is ongoing.[10]

### C. A Conflict

Now lay the two lawsuits next to each other --- and zero in on the Lawyer's role in each.

In this case, the Lawyer represents the Plaintiff --- a server at the Restaurant who is suing for a proposed class that includes the Busser.

In the sexual harassment case, the Lawyer represents a different plaintiff --- a different server at the Restaurant who is suing, among others, the Busser.[11]

So here, the Lawyer aims to represent the Busser, as a class member. And in the other case, the Lawyer is representing an individual suing the Busser.

---

[9] Another Restaurant employee was also sued. See Discrimination Complaint ¶¶ 16-20. Put him aside. He does not matter here.

[10] The Plaintiff filed her own sexual harassment lawsuit against the Defendants (and others). See First Amended Complaint, Lee v. Dong Bang Corp. et al., No. 22-cv-6338, (D.N.J. May 10, 2024) (ECF 29). But that lawsuit is now wrapped up. It settled. See Order of Dismissal, Lee v. Dong Bang Corp. et al., No. 22-cv-06338 (D.N.J. Sep. 4, 2025) (ECF 63).

[11] The complaint in the sexual harassment lawsuit is not crystal clear as to who the Busser is. But in this case, the Defendants say he is the "Mario" referred to in the complaint in the sexual harassment lawsuit. See Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Certify Class (ECF 114) at 20-21; see also Discrimination Complaint ¶¶ 16, 21. And the Plaintiff, in response, has conceded as much --- she does not argue the Defendants have gotten things wrong in saying that "Mario"/the Busser is a class member here. See Amended Declaration of Ryan Kim ("Kim Declaration") (ECF 119-1) ¶ 15.

The Lawyer, in short, is for the Busser in this case and against him in another.

Is this a conflict of interest?

The question matters because (i) a conflict can lead to disqualification;[12] (ii) a disqualified attorney cannot be an adequate lawyer for the proposed class;[13] and (iii) if there is no adequate lawyer in the mix --- a motion to certify the class, the motion currently pending before the Court, must be denied.[14]

So a good deal likely turns on whether the Lawyer does or does not have a conflict of interest here.[15]

* * *

Out of the gate, things seem obvious: there is a conflict.

When a lawyer's "representation of one client will be directly adverse to another client" --- that is one of the most basic sorts of conflict of interest. See Model Rule of Professional Conduct ("Model Rule") 1.7(a).[16]

---

[12] See IBM Corp. v. Levin, 579 F.2d 271, 283 (3d Cir. 1978); Rizzuto v. De Blasio, 2019 WL 1433067, at *10 (E.D.N.Y. Mar. 29, 2019); Englebrick v. Worthington Indus., Inc., 2011 WL 13134603, at *4 (C.D. Cal. Nov. 23, 2011); Eternal Preservation Assocs., LLC v. Accidental Mummies Touring Co., LLC, 759 F. Supp. 2d 887, 892 (E.D. Mich. 2011).

[13] See footnote 7.

[14] See In re Constar Int'l, 585 F.3d at 780; Baby Neal, 43 F.3d at 55.

[15] The hedge ("likely") is there because sometimes a lawyer's conflict can be managed in ways that pull up short of disqualification. The parties do not discuss those sorts of options here, save for one. See footnote 52.

[16] The Model Rules of Professional Conduct are on the table here for two reasons. First, because in this district New Jersey's disciplinary rules apply to issues related to attorney ethics. See L. Civ. R. 103.1(a). And those disciplinary rules are "based substantially on the [Model Rules]." A. v. B., 158 N.J. 51, 59 (1999). And second, because in federal court attorney disqualification issues are ultimately a matter of federal common law, see Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1316 (3d Cir. 1993) --- and federal common law is informed by "the principles and rules set forth in the . . . Model Rules of

And one classic sort of "direct[] advers[ity]" is an attorney suing his own client. See id. cmt. 6.

So the everyday, bread-and-butter rule is this: a lawyer working for a client in case-1 cannot turn around and sue the client in case-2.

Call this "the general rule."[17]

Under the general rule, the Lawyer seems to have a conflict of interest. Because the Lawyer's client in this case (the Busser) is being sued by the Lawyer's client in the sexual harassment case.

But there may be an out. Take up that possibility now.

---

Professional Conduct." See In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160-61 (3d Cir. 1984); see also United States v. Bellille, 962 F.3d 731, 738 (3d Cir. 2020).

[17] Why is there normally a conflict when an attorney sues her case-1 client in case-2? The law in this area flows from a lawyer's duties of loyalty and confidentiality, see footnote 30, and suing one's own client pushes up against each duty. Loyalty because that duty "prohibit[s] the [attorney] from harming the client." Restatement (Third) of the Law Governing Lawyers ("Restatement") § 16 cmt. e (A.L.I. 2000). And suing someone is almost always to harm him. As to confidentiality, a lawyer cannot use what she learns in the course of representing a client to hurt him. See Model Rule 1.6(a). But a good lawyer presses to learn a lot about her client. Before a negotiation, how much does the client really have in the bank? Before a deposition, has the client ever been accused of lying or breaking the law? An honorable lawyer can try to mentally put aside in case-2 (where she is suing her client) what she learned in case-1 (where she represents him) --- information, say, about the client's finances, or about his past history and vulnerabilities. But compartmentalizing can be tough, and mistakes get made. And because everyone knows all that, allowing lawyers to sue their current clients is a recipe for tip-toeing attorney-client relationships that are guarded from the get-go. Why share fully with your lawyer if she might later use the information against you? A client should not have to be ginger with his lawyer now because she may sue him later. That would be a steep price --- to avoid paying it, a lawyer cannot sue her case-1 client in case-2.

## II. A Resolution?

At first blush, it seems that the Lawyer may be able to steer away from the conflict --- because there is an exception to the general rule that applies in class action cases.

The beginning of this Part, Part II.A., sets out that exception.

But the exception, the Court concludes, is not available here. Therefore, the Lawyer cannot use it as an off-ramp. The rest of this Part explains why. See Part II.B to Part II.D.

### A. The Class Action Exception

Per the Model Rules:

> When a lawyer represents . . . a class of plaintiffs . . . in a class-action lawsuit, unnamed members of the class are ordinarily not considered to be clients of the lawyer for purposes of applying [the conflict of interest rule sketched out above in Part I.C].

Model Rule 1.7 cmt 25.

A leading treatise puts it this way:

> Absent class members are not class counsel's clients in their individual capacity and hence counsel's conflicts with them at that level are immaterial to their representation of the class.

William B. Rubenstein, 6 Newberg & Rubenstein on Class Actions ("Rubenstein") § 19:21 (6th ed. 2026).[18]

Boiled down: "Absent class members do not create conflicts." In re Plasma-Derivative Protein Therapies Antitrust Litig., 2010 WL 1433316, at *4 (N.D. Il. Apr. 7, 2010).

* * *

The above sources describe a carve-out to the general rule. Call the carve-out "the class action exception."

---

[18] An "unnamed" class member is the word used in the Model Rules. But the treatise speaks of an "absent" class member. No matter. Those are the same thing. Both are terms for the members of a class who are not themselves named as class representatives.

The exception seems to open a path out of the Lawyer's conflict of interest.

After all, the Busser is a member of the proposed class in this case. But he is an "absent" class member. An "unnamed" class member, not a named one.

So the class action exception seems to suggest that there is no conflict of interest here.

The Lawyer is representing the Busser, and also suing him in the ongoing sexual harassment lawsuit. Normally a problem, true. But not here. Because of the class action exception, any conflict of interest that would otherwise be there is "immaterial." Rubenstein § 19:21. No "conflict[]" is "create[d]" in the first place. In re Plasma-Derivative Protein Therapies, 2010 WL 1433316, at *4.

* * *

But all of that is too quick.

Under the class action exception, unnamed class members "ordinarily" do not count as clients. See Model Rule 1.7(a) cmt 25 (emphasis added).[19]

But this is not an ordinary case.

First, the proposed class here is especially small. It has only 53 possible members. See Plaintiff's Brief at 1. This is much smaller than the typical class action.[20]

---

[19] The cited treatise picks up on the "ordinarily" qualifier. See Rubenstein, § 19:21. And the caselaw, too. See, e.g., In re Rail Freight Fuel Surcharge Antitrust Litig., 965 F. Supp. 2d 104, 116 (D.D.C. 2013).

[20] For some comparison points, see, for example: (i) Michael Kheyfets, Edgeworth Insights, Analyzing Biometric Data Privacy Class Action Settlements (Apr. 12 2024) ("The median size of [non-workplace biometric data breach classes] is approximately 63,450 people, with some classes . . . consisting of millions[.]"), available at: https://www.edgewortheconomics.com/insight-Analyzing-Biometric-Data-Privacy-Class-Action-Settlements; (ii) Fed. Trade Comm'n, Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns 20-21 (2019) (from here, "Fed. Trade Comm'n, Consumers and Class Actions") ("The median number of notice recipients in our sample was 87,195."); (iii) Brian T.

And a second difference matters, too.

Most class actions bring together people who are strangers to each other. Everyone who bought IBM shares last year does not know everyone else who did. The people who leased a particular Ford F-150 or who were prescribed a defective painkiller or who had their social security numbers taken in a data breach --- very few of them will know each other.

But not here.

The 53 proposed class members in this case worked in the same Restaurant. See Complaint ¶ 1. It is no chain. One location. See id. And it is odds-on that members of the proposed class knew each other. They were expected to work as a team --- the servers getting down the orders, and the bussers coming out with the plates of food. See Plaintiff's Deposition at 37:20-38:21. And at the end of every shift, the servers and bussers all got together to divvy up the tip pool. See Plaintiff's Deposition at 66:19-21, 71:8-22; Ju Hi Kim Deposition at 89:10-14 .

A small proposed class. And one built around the daily comings-and-goings of close colleagues in a single workplace.

Does all of that that make a difference here?

Yes, the Court concludes.

In the circumstances here, the underlying reasons why the class action exception is there in the first place --- those do not apply. And so it follows that the exception itself should not apply here.

To begin seeing the point, take up in the next section two core rationales for the class action exception.

---

Fitzpatrick & Robert C. Gilbert, An Empirical Look at Compensation in Consumer Class Actions, 11 N.Y.U. J. L. & Bus. 767, 780 (2015) ("The number of class members in these fifteen cases ranged in size from 28,000 to almost 14 million, with an average size of 2.1 million and a median of over 800,000."); and (iv) Thomas E. Willging et al., Fed. Jud. Ctr., Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 14 (1996) (from here, "Willging et al., Empirical Study of Class Actions") ("The average size of the class was 45,055 and the median size was 45,920 members.").

### B. The Reasons for the Exception

The class action exception rests on two things.

First, a prediction that if the exception were not there, serious practical problems would often be created.

And second, a sense that the general rule[21] has less work to do in class action cases than in other cases. So jettisoning the general rule is not as costly in class action cases as it would be in others.

Work through these two justifications for the class action exception. See Part II.B.1 to Part II.B.3.

Then address whether they fit this case. The Court's conclusion: the two underlying rationales for the class action exception do not apply here, so the exception itself should not be applied here. See Part II.B.4.

#### 1. Practical Problems

One justification for the class action exception:

> Classes often run into the thousands, tens of thousands, hundreds of thousands, or even millions. It is somewhat inevitable that among the throng of absent class members in a class action are individuals or entities to whom class counsel might be adverse in another matter.

Rubenstein § 19:21.

Use a hypothetical to unpack the concerns that the just-quoted treatise excerpt seems to be getting at.

* * *

Say that a lawyer is working on three class actions lawsuits.[22]

---

[21] That a lawyer representing a client in case-1 cannot sue the client in case-2.

[22] Applying Rule 23, courts generally assess whether the proposed class counsel is deeply experienced in the class action space. See Burrows v. DC Portfolio Servs., LLC, 2025 WL 2304797, at *7 (D.N.J. Aug. 11, 2025); In re Humanigen, Inc. Sec. Litig., 2024 WL 4182634, at *9 (D.N.J. Sep. 13, 2024); Badia v. HomeDeliveryLink, Inc., 2015 WL 5666077, at *4 (D.N.J. Sep. 25, 2015); First State Orthopaedics v. Concentra, Inc., 534

The first is against an ice cream company. It allegedly lied about its pistachio flavor --- falsely advertising that the ice cream gets its taste from the real thing, not just from a mix of chemicals.[23]

The lawyer is working on an antitrust case, too. A set of airlines got together to keep ticket prices high --- and she is representing their customers.[24]

And finally, a products-liability case --- a particular airbag did not work, so people who bought the makes and models that were outfitted with the airbag are getting together to sue the car manufacturers.[25]

* * *

Now imagine that a new case walks in the door, a fourth case.

Say that an oil company issues an 8-K indicating that it has made major accounting errors and will need to restate its financials for the last two quarters. In the hours that follow, the stock price falls and investors gear up to sue. To sue the company, yes. But also its CFO, based on things he said on a recent earnings call.

Imagine, now, that a group of investors ask the class action lawyer to represent them --- and she is trying to think through whether she can take on the case.[26]

---

F. Supp. 2d 500, 512 (E.D. Pa. 2007); In re Ikon Off. Sols., Inc., Sec. Litig., 194 F.R.D. 166, 176-77 (E.D. Pa. 2000); see also Fed. R. Civ. P. 23(g)(1) (making "counsel's experience in handling class actions" a factor a district court "must" consider when appointing class counsel). That is, when it comes to class actions, the law expects specialists --- even, via Rule 23, requires them. So it makes sense to think that a typical class action lawyer is juggling a few class actions at once. That is what specialists do. They handle the same sort of cases over and over again.

[23] This is based on a real case. See Duncan v. Kahala Franchising, L.L.C., 732 F. Supp. 3d 255 (E.D.N.Y. 2024).

[24] Roughly as in In re Domestic Airline Travel Antitrust Litigation, 322 F. Supp. 3d 64 (D.D.C. 2018).

[25] Modeled on In re ZF-TRW Airbag Control Units Products Liability Litigation, 2025 WL 2684021 (C.D. Cal. Aug. 15, 2025).

[26] Any conflict that she might have --- everyone in her firm will generally have it, too. See Model Rule 1.10(a).

What is her first move?

* * *

Answer here as if there were no class action exception.

If there were no such exception, the general rule would control --- and under that rule, the lawyer could not sue anyone she is already representing in a class action.

So the lawyer could not say yes to the new case, the one that involves suing the oil company CFO, without first doing a real investigation.

Does the CFO like pistachio? If yes, the CFO may be on the plaintiffs' side in the ice cream class action --- and if so, the lawyer cannot take on the new case against the CFO, because the CFO is, in the ice cream case, already the lawyer's client.

Does the CFO own a car that has one of the airbags? Has he bought a plane ticket on one of the relevant airlines?

If yes to either of these, same result --- the lawyer cannot accept the oil-company case because she has a conflict of interest. The lawyer represents the CFO and, therefore, cannot now sue him.

And note here that accurately answering the relevant due-diligence questions, about ice cream and airbags and plane tickets --- none of that will be easy.

In an ordinary context, running a conflict check is a smooth and structured thing. The work starts with a quick search of the firm's client list. And it will often end there --- maybe with a quick check-in along the way with the firm's conflicts committee, to ve sure that everyone is looking around the corners, that nothing is being missed.

But in the class action context none of that realistically works.

The reason why: class action lawyers will typically know the precise identities of people in the class they represent only toward the end of their work on a given case --- around when the time comes to send off notices, or even afterwards.[27]

---

[27] Courts routinely note the "far advanced" stage of a case when "the full membership of the class is []known." See Union Carbide Corp. v. U.S. Cutting Serv., Inc., 782 F.2d 710, 714-15 (7th Cir. 1986); see also Koby v. ARS Nat'l Servs., Inc., 846 F.3d 1071, 1076-77 (9th Cir. 2017); Specialty Cabinets & Fixtures, Inc. v. Am. Equitable Life Ins. Co., 140 F.R.D. 474, 476 (S.D. Ga. 1991); cf. Kerner v. City & Cnty. of Denver, 2013

So how would the hypothesized lawyer be able to determine what the oil-company CFO eats and drives and where he has flown to?

There is no straightforward way to get to reliable answers. After all, unless the pistachio and airbags and airline cases are at the end of the line --- the class action lawyer will have no quick-and-easy way to know if the CFO is in the plaintiffs' class (and therefore her client) in any of those cases. The data for a hard-edged assessment will likely not be there.

* * *

Bottom line: in a world with class action specialists, see footnote 22, but without the class action exception, it would often be the case that a class action lawyer would not be able to take on a new case without an investigation that is difficult to do --- let alone reliably. How to figure out what stocks the CFO owns? How to be confident that one has the right answer?

And note: there would be a tough price to pay for getting things wrong. Take on the oil-company case, but then learn (maybe years later) that the CFO was in the pistachio class --- and there is a risk that all of the work invested by the lawyer in the oil-company case will have to be put aside. Written off by the lawyer and her firm as a waste, because the lawyer had a conflict all along.[28]

---

WL 1222394, at *2 (D. Colo. Mar. 25, 2013). Sometimes knowing who is in the class comes a bit earlier --- but not always before the class certification motion. See In re Liquid Aluminum Sulfate Antitrust Litig., 2017 WL 3131977, at *19 (D.N.J. July 20, 2017) (explaining, on a motion for class certification, that "class discovery will unveil the various members of the currently unknown class"); Berger v. Philip Morris USA Inc., 49 F. Supp. 3d 1065, 1070 (M.D. Fla. Sep. 24, 2014); Poore v. American-Amicable Life Ins. Co. of Tex., 125 F. Supp. 2d 1378, 1387 (S.D. Ga. 2000). And it is at the class certification stage when issues of lawyer adequacy --- and therefore conflicts of interest --- need to be ironed out. See Maio v. Aetna Inc., 1999 WL 800315, at *3 (E.D. Pa. Sep. 29, 1999); cf. In re Fine Paper, 617 F.2d at 24.

[28] Two points here. First, beyond frittering away a lawyer's time and money, late-stage disqualification can also slow things down for the plaintiffs, who are waiting on a hoped-for recovery. See In re Katrina Canal Breaches, 2008 WL 3845228, at *6 ("Finding replacement counsel . . . will significantly, if

* * *

In short, given the "throng" of absent class members in most class actions, Rubenstein § 19:21, it is "somewhat inevitable," id., that there will be a high cost to applying the general rule that a lawyer cannot sue her case-1 client in case-2. That predicted cost is one of the reasons there is an exception to the general rule --- the class action exception.[29]

Without such an exception, "class counsel could easily be disqualified." Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 589 (3d Cir. 1999). And that is a reason not to "mechanically transpose[]" the general rule to class actions. See id.

---

not fatally, stall the class suit."); see also Sharp v. Next Entertainment, Inc., 163 Cal. App. 4th 410, 434 (Cal. Ct. App. 2d Dist. 2008). Second, note that disqualification is a sanction. (An "extreme" one, per some courts. See, e.g., Metro Container Grp. v. AC&T Co., 2022 WL 1748550, at *2 (E.D. Pa. May 31, 2022); Adegbuji v. Middlesex Cnty., 2004 WL 7334268, at *2 (D.N.J. Aug. 5, 2004).) A punishment to deter attorney misconduct. See Prosser v. Prosser, 186 F.3d 403, 406 (3d Cir. 1999). But if a class action lawyer can do little on the front-end to confidently avoid ending up adverse to one of her clients --- does it make sense to impose on her the harsh medicine of a disqualification sanction? See Nancy J. Moore, "Who Should Regulate Class Action Lawyers?", 2003 U. Ill. L. Rev. 1477, 1491 (2003).

[29] See In re Katrina Canal Breaches, 2008 WL 3845228, at *7; Sharp, 163 Cal. App. 4th at 434; compare Dean v. Kraft Foods N. Am., Inc., 2004 WL 614588, at *3 (E.D. Pa. Mar. 26, 2004) (applying the class action exception and noting that the class member who would otherwise have posed a conflict was "a minor player in a class of more than 1,000 members"), and In re Katrina Canal Breaches, 2008 WL 3845228, at *6 (applying the class action exception where "the [class] . . . could potentially number in the tens of thousands"), with Lewis v. N.F.L., 146 F.R.D. 5, 7, 10-12 (D.D.C. 1992) (applying the normal conflict of interest rule, that a lawyer in case-1 cannot sue a client in case-2, and not taking up the class action exception --- and noting that the proposed class had only about 250 members, and that the class counsel was suing 20 of them).

### 2. Confidentiality

As set out just above, see Part II.B.1, applying the general rule to class actions would likely have a serious negative impact on the basic workability of class action litigation.

That is a price that is not worth paying. Why not? In part because the general rule starts off on its back foot in class actions. The general rule does not do as much work in class actions as it does in more run-of-the-mill cases. So there is less reason to hold onto the rule. This section explains.

* * *

Conflict of interest rules are mainly there to protect the duties of (i) confidentiality and (ii) loyalty.[30]

As to confidentiality, the conflict-of-interest rules back this duty up by forcing lawyers to avoid situations (like suing a client) where there is too great a risk that confidential information will be misused. See footnote 17.

This helps protect the "full and open"[31] back-and-forth that should be there between a client and his lawyer --- to calm anxieties the client might otherwise have about completely confiding in his attorney. See, e.g., City and Cnty. of S.F. v. Cobra Sols., Inc., 38 Cal. 4th 839, 846 (2006); see also Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 570-71 (2d Cir. 1973); Honolulu Civ. Beat Inc. v. Dep't of Att'y Gen., 146 Hawai'i 285, 297-98 (2020); Model Rule 1.6 cmt 2 ("The client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter.").

---

[30] See In re Conduct of Conry, 368 Or. 349, 362 (2021); Shoemaker v. Gindlesberger, 118 Ohio St. 3d 226, 230 (2008); City and Cnty. of S.F. v. Cobra Sols., Inc., 38 Cal. 4th 839, 846 (2006); Griffith v. Taylor, 937 P.2d 297, 301 (Alaska 1997). Loyalty is sometimes said to be the main issue. See Argue v. David Davis Enters., Inc., 2004 WL 2480836, at *2 (E.D. Pa. Nov. 4, 2004); Manoir-Electroalloys Corp. v. Amalloy Corp., 711 F. Supp. 188, 195-96 (D.N.J. 1989). But confidentiality counts too. See, e.g., Restatement § 60 reporter's note to cmt. c(i).

[31] Cobra Sols., Inc., 38 Cal. 4th at 846.

But in most class action cases[32] --- what confidential communication is really likely to happen between the class lawyer and the thousands or even millions of people in the class?

Relatively little.

Class counsel "rarely" communicate with class members "until there is a settlement or until class certification has been granted." Alissa del Riego & Joseph Avery, The Class Action Megaphone: Empowering Class Members with an Empirical Voice, 76 Stan. L. Rev. Online 1, 3 (2023).

At those points, opt-out notices will go out, and checks too.[33] But these are unilateral, same-across-the-board, lawyer-to-client messages. They do not depend on a trusting sense from the client that his confidences will be kept --- because his confidences, in those communications at least, do not matter. He is not saying anything.

To be sure, this is not all there is.

There may, for example, be communications closer to the beginning of the case --- class counsel may use a website, for example, to solicit experiences with the defective product. Or a person who objects to a settlement may write to her lawyer in the weeks before the final approval conference, before she writes to the judge.[34]

---

[32] See footnote 20 as to the size of some classes.

[33] Opt-out notices in advance of the final settlement approval conference. See Fed. R. Civ. P. 23(e)(1), (3). Checks if the class wins at trial or the case settles. See, e.g., Bellan v. Cap. Blue Cross, 2022 WL 736441, at *2 (M.D. Pa. Mar. 10, 2022).

[34] Some preliminary-approval orders envision just that. See Order Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Electric Last Mile Order"), In re Elec. Last Mile Sols, Inc. Sec. Litig., No. 22-cv-0545 (D.N.J. Mar. 3, 2026) (ECF 181) at 11-13; Order Preliminarily Approving Settlement and Providing for Notice of Settlement ("Celgene Order"), In re Celgene Corp. Sec. Litig., No. 18-cv-04772 (D.N.J. Dec. 19, 2025) (ECF 493) at 11-13. Note that the objection rate is typically very low. So as a practical matter, not that many people are reaching out to their lawyers via an objection. See Theodore Eisenberg & Geoffrey Miller, The Role of Opt-Outs and Objectors in Class Action Litigation:

And at least some confidential information will almost always be in play. For example, to put hands on a securities recovery a class member will have to send the claims administrator some proof of when they bought the stock in question.[35] That is private information.

But these here-and-there exceptions do not change the bigger picture --- that class action lawyers spend much less time privately going back and forth with their clients than other lawyers do.[36]

If the "conflict rules are best understood as rules of risk avoidance"[37] --- then the risk of confidential-information misuse in the class action context is simply too faint to warrant the heavy costs[38] of applying the general rule[39] without a class action exception.

* * *

Where it comes up, the duty of confidentiality works in the same way virtually everywhere --- confidential client information has to stay confidential.

But "where it comes up" is the rub.

Client confidentiality issues arise less frequently in class action contexts because class action lawyers simply spend much

---

Theoretical and Empirical Issues, 57 Vand. L. Rev. 1529, 1532 (2004) (~1% objection rate); see also Fed. Trade Comm'n, Consumers and Class Actions at 11 (.0003% objection rate); Willging et al., Empirical Study of Class Actions at 178 (showing that ~52% of sampled class actions had no objectors).

35 See Electric Last Mile Order at 7-9; Celgene Order at 9-10.

36 The idea that class action lawyers spend markedly less time in private communication with their clients --- this is a familiar point. See, e.g., Nicholas Almendares, The Undemocratic Class Action, 100 Wash. U. L. Rev. 611 (2023); Susan P. Koniak & George M. Cohen, In Hell There Will Be Lawyers Without Clients or Law, 30 Hofstra L. Rev. 129 (2001).

37 Bruce A. Green, Conflicts of Interest in Litigation: The Judicial Role, 65 Fordham L. Rev. 71, 71-72 (1996) (cleaned up).

38 See Part II.B.1.

39 That a lawyer cannot sue in case-2 the client she is representing in case-1.

less time privately talking to a given client than other lawyers would. A lawyer who has two clients on a case will get to know those clients --- closely, individually. Not a lawyer who has 2 million clients --- whose 2 million claims can be handled on a class-wide basis precisely because those claims are mainly the same. See Fed. R. Civ. P. 23(a)(2); Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

The duty of confidentiality is there, in part, to ensure the right kind of connection between lawyers and clients. And while it is important to keep that road "full and open"[40] --- it is a road that is much less traveled in class action cases than in other ones.[41]

### 3. Conclusion

The class action exception is a carve-out from the general rule, the rule that a lawyer representing a client in case-1 cannot then sue him in case-2.

The exception is there for two main reasons.[42]

First, because the practical costs of doing without such an exception would be high. See Part III.B.1.

And second because the general rule is based, in part, on a need to protect attorney-client confidences. But that concern is in play much less frequently in class action cases. So in the class action context, there is less reason in the first place for the general rule. It has less work to do.[43]

---

[40] Cobra Sols, Inc., 38 Cal.4th at 846.

[41] See In re Glassine and Greaseproof Paper Antitrust Litig., 88 F.R.D. 302, 305-06 (E.D. Pa. 1980) (relying on In re Fine Paper, 617 F.2d 22); see also In re Plasma-Derivative Protein Therapies, 2010 WL 1433316, at *2; Dean, 2004 WL 614588, at *3; cf. In re Rail Freight Surcharge, 965 F. Supp. 2d at 1115.

[42] And maybe a third, as discussed in the next footnote.

[43] There may be a third reason, a duty-of-loyalty-based reason, for the class action exception to the general rule. This footnote explains.

Good lawyers work to see the full landscape of a client's needs and goals. A 360 degree view, not tunnel vision. Approaching things this way, lawyers can end up identifying not just with

their client's claims, but also with their clients themselves. And it is against this backdrop that our law applies the general rule. On the idea that it is disloyal for a lawyer to hurt a client (in case-2, by suing him) even if the lawyer is doing right by the specific claims (in case-1) she was hired to handle. See DeFalco, 644 F.2d at 136 (describing the lawyer's focus on the "undivided interests of his client") (emphasis added); Restatement § 16 cmt. e (discussing the lawyer's obligation to "promot[e] the objectives of the client") (emphasis added). And on the idea that the client, working from the same expectations, may well see a case-2 lawsuit by his lawyer as a "betray[al]." Model Rule 1.7(a) cmt. 6.

But things may look different in the class action context. First, class actions are relatively de-personalized. The class lawyer knows a person's claims, but probably not the person. See, e.g., In re Gibson Greetings Sec. Litig., 159 F.R.D. 499, 500 (S.D. Ohio 1994) ("In a large class action, it is probable that the vast majority of the class members have never heard of the class plaintiff or class counsel."); see also footnote 20. And a given class member's claim is not a unique one-off --- if it was, the claim could not be in a class action in the first place. See Wal-Mart, 564 U.S. at 350. And second, any particular class member is rarely called on to make litigation decisions. See In re Suboxone Antitrust Litig., 967 F.3d 264, 273 (3d Cir. 2020) (describing the idea that even the class representative "direct[s] and manage[s]" the class action as "sheer sophistry") (cleaned up); cf. Greenfield v. Villager Indus., Inc., 483 F.2d 824, 831 n.6 (3d Cir. 1973); In re Am. Fam. Enters., 256 B.R. 377, 417 (D.N.J. 2000). So being distracted by a second lawsuit may not have a negative blowback-effect on how the first lawsuit goes --- the sort of blowback that can seem disloyal if the second lawsuit is brought by the lawyer from the first lawsuit.

Class lawyers have loyalty duties "to the class as a whole[.]" Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 964 (3d Cir. 1983). But because of the two points set out here, it may make less sense to expect lawyers to single-mindedly pursue the interests of the individuals within the class --- all the way to the point of not suing those individuals in other cases. Given the realities of class action lawyering, the general rule may get out beyond what loyalty really demands --- and that might,

### 4. Implications

Given the two[44] underlying reasons for the class action exception --- should that exception be applied here?

No, the Court concludes. This section explains.

* * *

The first justification[45] applies in large-scale cases, but less obviously in narrow-gauge cases --- and certainly not in this one.

There is no "throng"[46] of people in the proposed class here. Just 53. And those 53 people are not unknown --- their identities to be revealed only much later, when it becomes clear who in particular actually bought the plane tickets or the oil-company stock or the gallon of ice cream. The proposed class members are not obscure to each other --- they worked closely together in the same one-location local restaurant.

From the outset, it would not have been hard for the Lawyer to reliably learn that the Busser in the proposed class here is the same person the Lawyer is suing in another case. It would have been easy.

The class action exception is there, in part, because of the practical problems that would follow if the exception were not there.

But the practical-problem rationale gets no real traction here. In this case, the only thing that may ultimately make things

---

as noted, be a third reason why the class action exception exists.

The Court, though, ultimately lands on no definitive view. There are potential difficulties with the line of thinking laid out here. And there are other reasons to conclude, as the Court does in Part II.B.4., that the class action exception does not apply in this case.

[44] Or three. See footnote 43.

[45] Sketched out in Part II.B.1.

[46] See Rubenstein § 19:21.

"unworkable," id.,[47] is the Lawyer's two-sided interaction with the Busser --- and that is something that he (the Lawyer) could have easily seen in advance and side-stepped.

* * *

The second reason for the class action exception: in the typical large-scale class action, the duty of confidentiality does not, as a practical matter, need much safeguarding --- so less is lost by doing without the normal prohibition on a lawyer not suing a case-1 client in case-2.[48]

But that rationale for the general rule does not fit the situation here.

In this case, the Busser will likely attract attention from the Defendants, as a possible weak link in the Plaintiff's case. He has been accused of sexually harassing a colleague at the Restaurant. For the Defendants, he is an obvious person to zero in on and depose. To ask, say, about one of the core issues in the case --- whether notice of the tip credit was given by management to the Restaurant workers. See Complaint ¶¶ 52-55.

To prepare for this sort of deposition, there is a dog-eared playbook for the Lawyer to pull down off the shelf. Have a full and candid sit-down with the Busser. Talk through how he has interacted with his Restaurant colleagues and others, so as to begin to prepare the Busser for what may be a tough deposition. Lies he may have been caught in. Sore subjects that may throw him off while testifying. Past trouble with the law. And any sexually harassing conduct --- its true and full scope.

In short, anything that could undercut the Busser's credibility and that the Defendants might know --- and that could be a lot, given that the Defendants here include the Restaurant owner-operators, who worked with the Busser on a daily basis.

But this sort of deposition preparation by the Lawyer of the Busser --- it would seem to open the way to deep confidentiality (and duty of loyalty) problems.[49]

---

[47] Bash v. Firstmark Standard Life Ins. Co., 861 F.2d 159, 161 (7th Cir. 1988) (quoted in Lazy Oil, 166 F.3d at 590).

[48] For the fuller discussion, see Part II.B.2.

[49] Cf. Dean, 2004 WL 614588, at *3 (applying the class action exception because the class counsel had "extremely limited

After all, the deposition preparation could easily put the Busser in a bad place. Telling his Lawyer negative things about himself to be helpful in this case --- that would provide the Lawyer with negative information relevant to examining the Busser in the other case, the sexual harassment one.[50]

* * *

Bottom line: neither the first nor the second underlying justifications for the class action exception apply in this case --- so it does not make sense for the exception itself to be applied here.

That leaves the general rule in place. And under the general rule, the Lawyer has a conflict of interest --- he is representing the Busser in this case, and suing the Busser in another case.[51]

---

contact" with potential-conflict-posing client and "received no information, confidential or otherwise," that could possibly be relevant in case in which class counsel was suing the client).

[50] The point is not that the Lawyer would purposefully use the Busser's confidences against him. Even if that were not to happen, information from the Busser would be hard for the Lawyer to fully suppress. And sensing that, the Busser may not be forthcoming. See footnote 17.

[51] And the conflict could well be an especially pointed one. The Lawyer, as noted, may well have to defend the Busser's deposition here. And he will almost surely have to take the Busser's deposition in the other case --- in the sexual harassment suit, where the key allegations relate to the Busser's alleged harassment, see Discrimination Complaint ¶¶ 21, 24, the plaintiff will almost surely seek to energetically examine the Busser. Examining a client as an adverse witness --- that often makes for intense duty-of-loyalty difficulties. See, e.g., Hamilton v. City of Hayti, 2014 WL 7157329, at *4 (E.D. Mo. Dec. 15, 2014); Baas v. Dollar Tree Stores, Inc., 2008 WL 906496 (N.D. Cal. Apr. 1, 2008), at *1-4; In re Cendant Corp. Sec. Litig., 124 F. Supp. 2d 235, 241-42 (D.N.J. 2000); cf. All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund, 2010 WL 2243351, at *3-7 (E.D.N.Y. June 1, 2010). And if the Busser denies that he engaged in sexual harassment, the Lawyer may well aim to establish through cross-examination that the Busser --- his client in this case --- is both a liar and a sexual harasser. This would go a long way to "harming" the Busser,

This problem needs to be addressed for the Court to determine if each of the Rule 23 boxes has been checked in this case. For now, the Lawyer is representing the proposed class --- but it is not clear whether he is "adequate," as under Rule 23 he needs to be.

## III. Next Steps

Can the Lawyer adequately represent the proposed class given the conflict of interest he is operating under?

For now, this question will stay a question. The Court could work through it on its own. But the wiser course is to permit supplemental filings.

To give the Lawyer a chance to explain how he proposes to address the issues here.[52] And to allow the Defendants to respond.

A separate order will issue as to the timing of these filings.

* * *

On this 24th day of November, 2026.

Michael E. Farbiarz, U.S.D.J.

---

Restatement § 16 cmt. e --- and would potentially spin off serious duty-of-loyalty problems.

[52] Steps short of disqualification may potentially be available. For example, the Lawyer alludes to eliminating any conflict by removing the Busser from the proposed class. See Kim Declaration ¶ 15. (Note that strong headwinds would push against that sort of proposal. Cf. Lewis, 146 F.R.D. at 12.)